IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                          Criminal No. 3:23cr101

RIEZON MEKHI MURPHY,
a/k/a Reizon Mekhi Murphy

MEMORANDUM OPINION

This matter is before the Court on DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND MEMORANDUM IN SUPPORT (ECF No. 23) (the "Motion"). For the following reasons, the Motion will be denied.

BACKGROUND

I. Procedural Background

On August 15, 2023, Riezon Mekhi Murphy ("Murphy") was indicted on four counts: (1) one count of Possession of a Firearm and Ammunition by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1), (2) one count of Possession with Intent to Distribute 50g or More of Methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii), (3) one count of Possession with Intent to Distribute Cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and (4) one count of Possession with Intent to Distribute 40g or more of Fentanyl, in

violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(vi). ECF No. 17. Murphy filed the Motion on September 14, 2023.

## II. Factual Background

On August 27, 2022, at around 8:45 p.m., two officers were patrolling Hale's Trailer Park ("Hale's") in response to an anonymous tip of narcotics dealing that had been submitted almost four weeks earlier on August 1, 2022. ECF No. 23 at 1; ECF No. 27 at 1-2; ECF No. 33 ("Transcript") 9:9-12:2. The trailer park road begins as a "semi-paved" road that splits into two forks with one fork going toward a cul-de-sac and another going toward a one-lane gravel loop around five or so homes. ECF No. 35 at 3; Transcript 15:6-22, 65:13-18. The parties dispute whether the roads within Hale's are highways subject to Virginia's traffic laws. ECF No. 27 at 2; ECF No. 28 at 2.

While the officers were driving around the single-lane loop within Hale's, they encountered a black Audi sedan idling on the road in front of them with the headlights on. ECF No. 23 at 1; Transcript 28:6-9. The Audi was blocking the road so that the officers could not pass around it without leaving the road and traveling on the grass. ECF No. 27 at 3; Transcript 33:14-16, 75:25-76:2. So, the officers pulled up "nose-to-nose" with the Audi, and after waiting for around ten seconds, they activated the patrol car's so-called "takedown" lights—a bright spotlight

2

whose function was to illuminate the area in front of the patrol car. ECF No. 27 at 3; Transcript 33:14-25.

The "takedown" lights allowed the officers to observe a black male in the driver's seat (Murphy) and two white males who were "sitting on top of each other" in the passenger seat. ECF No. 27 at 3; Transcript 34:16-22. The occupants appeared "shocked" by the light. Transcript 34: 12-13. The Audi's headlights then cut off, despite the dark and rainy conditions, and the driver began backing up. ECF No. 27 at 3; Transcript 39:16-19. Both officers saw the car angle itself so that it faced toward the exit. Transcript 39:20-25, 82:8-24.

At that point, the officers turned on the emergency blue lights and initiated a traffic stop. Transcript 41:13-22, 83:24-84:3. The Audi complied. ECF No. 27 at 3; Transcript 41:10-12. The officers testified that obstructing a highway, driving without headlights in the dark, and driving without a seatbelt were ticketable traffic offenses. Transcript 36:1-13, 39:13-15, 78:14-20, 81:20-24; ECF No. 27 at 2-3.

The officers conducted a search of the Audi during the stop. ECF No. 27 at 5. Around the driver's seat, the search uncovered a stolen and loaded Tisas Zigana PX-9, 9mm pistol, approximately one-thousand dollars in cash, and two cell phones. Id. at 5-6. In the back passenger area, the officers found and

searched a gray backpack. Id. at 5. The backpack contained 45.03 grams of a heroin/xylazine/fentanyl mixture, 4.78 grams of fentanyl, 26.02 grams of cocaine, 96.68 grams of methamphetamine, and 222.17 grams of marijuana. Id. at 6.

Murphy argues that the stop violated his Fourth Amendment rights and that the evidence obtained as a result should be suppressed. ECF No. 23 at 4. The Government responds that the evidence should not be suppressed because there was no Fourth Amendment violation; the totality of the circumstances created a reasonable suspicion of criminal activity, and regardless, the traffic violations provided an independent basis for probable cause to stop the car. ECF No. 27 at 11. Murphy disagrees that the officers had reasonable suspicion to make the stop. ECF No. 28 at 2-3. As to the traffic violations, Murphy argues that those laws would not apply to the roads within Hale's since they are not highways pursuant to Va. Code Ann. § 46.2-100 (defining "Highway"). ECF No. 28 at 1-2; ECF No. 34 at 4-5.

## DISCUSSION

The Fourth Amendment protects "persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop for a suspected violation of law is considered a seizure. Heien v. North Carolina, 574 U.S. 54, 60 (2014). Therefore, to comply with the Fourth Amendment, a

4

traffic stop "must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct." United States v. Wilson, 205 F.3d 720, 722-23 (4th Cir. 2000) (en banc) (internal quotations omitted).

If there is reasonable suspicion that "criminal activity may be afoot," the officer may conduct a brief investigatory stop, otherwise known as a Terry stop. See Terry v. Ohio, 392 U.S. 1, 30 (1968). The reasonable suspicion standard is based on objective reasonableness and requires particularized, articulable suspicion that criminal activity is, or may be, afoot. Illinois v. Wardlow, 528 U.S. 119, 124 (2000); United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004). While the threshold for reasonable suspicion "falls 'considerably short of satisfying a preponderance of the evidence standard,'" it still requires more than an "inchoate and unparticularized suspicion or 'hunch.'" United States v. Griffin, 589 F.3d 148, 152 (4th Cir. 2009) (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)); Terry, 392 U.S. at 27. Courts should consider the totality of the circumstances known to the officer and "'the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience'" in assessing reasonable suspicion. United States v. Smith, 396 F.3d 579, 583 (4th Cir. 2005) (quoting Terry, 392 U.S. at 27).

5

An officer may also stop a vehicle if there is probable cause to believe that a traffic violation has occurred, even if the stop has a pretextual and subjective motive. Whren v. United States, 517 U.S. 806, 810 (1996); United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011). "Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." See Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983).

When an officer lacks reasonable suspicion or probable cause to make a stop, and the seizure therefore infringes on a defendant's constitutional rights, the evidence obtained as a result may be suppressed under the exclusionary rule. See Wong Sun v. United States, 371 U.S. 471, 484-85 (1963); Oregon v. Elstad, 470 U.S. 298, 308 (1985). In recent years, however, the Supreme Court has limited the suppression remedy for Fourth Amendment violations by holding that suppression of unlawfully obtained evidence is "applicable only . . . where its deterrence benefits outweigh its substantial social costs." Hudson v. Michigan, 547 U.S. 586, 591 (2006) (internal quotations omitted). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the

price paid by the justice system." <u>Herring v. United States</u>, 555 U.S. 135, 144 (2009).

## I. Did the Officers Have Reasonable Suspicion?

Murphy argues that the officers lacked reasonable and articulable suspicion to stop his vehicle, and therefore, the evidence resulting from the stop should be suppressed as fruit of the poisonous tree. ECF No. 23 at 2, 4. Murphy contends that a generalized tip of criminal activity submitted weeks before his stop coupled with an area being high crime does not establish the requisite suspicion to justify a <u>Terry</u> stop. ECF No. 23 at 3. Moreover, Murphy argues that an idling vehicle in a residential area with two individuals sitting in the front passenger seat, while unusual, does not inherently suggest criminal activity. <u>Id.</u> at 3-4.

The Government says that the totality of circumstances do rise to the level of reasonable, articulable suspicion of criminal activity when taken together. ECF No. 27 at 11. The Government also says that suppression is an extraordinary remedy and should only be applied "where its deterrence benefits outweigh its substantial social costs" which is not the case here. ECF No. 27 at 13-14 (quoting <u>Hudson</u>, 547 U.S. at 591).

The first issue is how much weight to accord the Crime Stoppers tip that was disclosed to the officers. The tip was

submitted nearly four weeks before the stop and involved a complaint about fentanyl manufacturing in Hale's. Transcript 10:24-25, 11:24-12:2. Nothing about that tip had any specific relation to Murphy or his Audi. Thus, the anonymous tip could indicate that Hale's had a high level of drug activity, but by itself, would not create any particularized suspicion of criminal activity as to Murphy or the conduct observed on August 27, 2022.

The reasonable suspicion analysis thus comes down to the officers' direct observations before making the stop. Though the officers never observed any actual criminal activity before activating their blue lights, "factors which by themselves suggest only innocent behavior may amount to reasonable suspicion when taken together." United States v. Perkins, 363 F.3d 317, 321 (4th Cir. 2004); United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993) (quoting Adams v. Williams, 407 U.S. 143, 145 (1972))("Even though the officers acknowledged that from their passing patrol car they could not see drugs or other contraband in the defendant's hand, the officers were not required in the absence of probable cause simply to 'shrug [their] shoulders and allow a crime to occur.'"). Indeed, "a key purpose of a Terry stop is to resolve the ambiguity between innocent and criminal actions." United States v. Henderson, 616

8

F. Supp. 3d 517, 523 (E.D. Va. 2022) (internal quotations omitted).

Here, Murphy's conduct was ambiguous, and the officers were acting within their constitutional limits by attempting to resolve that ambiguity. The officers first observed the Audi with its lights on, parked, and idling in the one-lane loop around Hale's at around 9 p.m. ECF No. 23 at 1; ECF No. 27 at 2; Transcript 33:9-11. They proceeded around the other side of the loop and eventually pulled up nose-to-nose with the Audi. ECF No. 27 at 3; Transcript 33:4-25, 75:21-24. The Audi did not attempt to move out of the way. Transcript 76:6-13.

To see what was going on in the dark, in this high-crime area, the officers turned on their "takedown" lights which revealed Murphy in the driver's seat and two adults in the front passenger seat sitting one on top of the other. Transcript 34:16-22, 77:12-17. This was certainly unusual. It is not a position one would expect to see if Murphy was simply picking up or dropping off these passengers. As one of the officers testified, the unusual seating arrangement indicated a short interaction. Transcript 38:3-10. Given the time of night, the occupants' shocked expressions, and Hale's history with drugs, the officers reasonably believed the occupants might be involved

in a drug transaction or some other illicit conduct. Transcript 38:3-20; 79:8-15.

Seconds later, the officers then observed the Audi cut its headlights, reverse somewhat quickly with two unrestrained passengers in the front seat, and point itself toward the exit. Transcript 39:16-25, 80:24-82:24. To the officers, this seemed like evasive behavior—a common and legitimate factor in determining reasonable suspicion. Transcript 83:7-11; See Wardlow, 528 U.S. at 124 ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); Lender, 985 F.2d at 154 (finding evasive behavior informative to the reasonable suspicion analysis when a suspect turned his back and walked away when the police exited their vehicle).

Finally, all of this occurred at night in an area that the officers personally knew had high levels of drug activity. Transcript 12:11-19, 65:1-7, 80:16-21. The officers were permitted to take this into account in assessing the situation. See Lender, 985 F.2d at 154 ("[A]n area's propensity toward criminal activity is something that an officer may consider."). In sum, the totality of the circumstances—the idling Audi blocking the road, the unusual seating position of the passengers, Murphy's evasive driving when the officers appeared, and Hale's reputation for drug activity—crossed the threshold

10

for reasonable suspicion that permitted the officers to make a lawful <u>Terry</u> stop. And, because the stop was lawful, suppression would not be warranted.

## II. Did the Officers Have Probable Cause to Make the Stop Based on the Observed Traffic Violations?

In the alternative, the Government argues that the officers had probable cause for the traffic stop because the officers observed Murphy commit multiple traffic violations: impeding the highway (Va. Code Ann. § 46.2-888), operating the vehicle in dark and rainy conditions without headlights (Va. Code Ann. § 46.2-1030), and having two unrestrained adult passengers in the front seat while the vehicle was in motion (Va. Code Ann. § 46.2-1094). ECF No. 35 at 6-7.

Murphy does not dispute what the officers observed. Instead, Murphy argues that the Virginia traffic laws cited by the Government only apply to "highways" within the meaning of Virginia law, and the gravel roadways of Hale's do not qualify as "highways." ECF No. 28 at 2; ECF No. 34 at 4-5. Hale's roads lack curbs, directional signs, and dividing lanes characteristic of typical "highways." ECF No. 34 at 4-5. Therefore, Murphy claims that the gravel trailer park road in this case is more of an access way to a parking area than a road unrestricted to

public vehicular travel. Id. at 5 (citing Caplan v. Bogard, 264 Va. 219 (2002)).

The Government responds that the roadway in Hale's is a highway because: (1) it is a neighborhood road; (2) it has a speed limit sign at the entry; (3) there are public amenities—a mailbox and a dumpster—within the neighborhood; (4) some of the trailers have no trespassing signs on their doors, suggesting that Hale's is open to the public and the residents expect it to be; (5) any member of the public could drive into Hale's, the only restriction being a "no soliciting" sign posted at the entrance; and (6) the road was "well-defined" between the travel area and where the residents parked their vehicles. ECF No. 35 at 7-9.

The three traffic violations asserted by the Government are only a basis for probable cause if committed on a highway. Va. Code Ann. § 46.2-888 ("No person shall stop a vehicle in such manner as to impede or render dangerous the use of the *highway* by others, except in the case of an emergency, an accident, or a mechanical breakdown.") (emphasis added); Va. Code Ann. § 46.2-1030 ("Every vehicle in operation on a *highway* in the Commonwealth shall display lighted headlights and illuminating devices as required by this article . . .") (emphasis added); Va. Code Ann. § 46.2-1094 ("Any driver, and any other person at

12

least 18 years of age and occupying the front seat, of a motor vehicle equipped or required by the provisions of this title to be equipped with a safety belt system, . . ., shall wear the appropriate safety belt system at all times while the motor vehicle is in motion on any *public highway*.") (emphasis added).[1] Thus, to determine whether the officers had probable cause to believe Murphy violated those traffic laws, the dispositive issue is whether the roads through Hale's are "highways" as defined in Va. Code Ann. § 46.2-100.

Highway is defined as:

the entire width between the boundary lines of every way or place open to the use of the public for purposes of vehicular travel in the Commonwealth, including the streets and alleys, and, for law-enforcement purposes, (i) the entire width between the boundary lines of all private roads or private streets that have been specifically designated "highways" by an ordinance adopted by the governing body of the county, city, or town in which such private roads or streets are located and (ii) the entire width between the boundary lines of every way or place used for purposes of vehicular travel on any property owned, leased, or controlled by the United States government and located in the Commonwealth.

Va. Code Ann. § 46.2-100. The Supreme Court of Virginia has interpreted the phrase "open to the use of the public" to mean "unrestricted access to the way." Kim v. Commonwealth, 797

---

[1] Va. Code Ann. § 46.2-1094 only requires wearing a seatbelt while the vehicle is in motion on *public* highways. This would suggest that seatbelts are not legally required on privately-owned highways, but this issue was not raised by the parties.

S.E.2d 766, 772 (Va. 2017) (emphasis in original) (contrasting unrestricted access with a limited or provisional right to access a road). That determination is a mixed question of law and fact. Kim, 797 S.E.2d at 769. Moreover, the test applies to both publicly and privately-owned areas, and a road need not be maintained by public funds to qualify as a highway. Kay Management Co., Inc. v. Creason, 263 S.E.2d 394, 401 (Va. 1980).

"The party seeking to establish that a particular way is a highway has the initial burden of presenting evidence of unrestricted access to the public." Kim, 797 S.E.2d at 772 (quoting Caplan, 563 S.E.2d at 724). Satisfying that burden will "give[] rise to [a] presumption that the way is a highway." Id. The opposing party may then rebut that presumption "by showing that the area was open only to those with 'express or implied permission from the owner[].'" Id.

To establish the initial presumption, a party must submit evidence of the public's unrestricted access for vehicular travel, which requires more than simply showing that the "public can or has used the way." Id. at 771. Thus, a mere lack of "physical barriers or security guards" at the entrance will not suffice. Id. at 771 (citing Caplan, 563 S.E.2d at 724). Although the Supreme Court of Virginia has not articulated exactly how much more must be shown, "the lack of a physical barrier in

14

conjunction with evidence that the roads at issue are named, feature traffic signs, curbs, and sidewalks, would amount to a sufficient showing of unrestricted access to give rise to the presumption that the road is a highway." Id. at 772; see also Kay Management, 263 S.E.2d at 400 (noting that the highways in an apartment complex "were paved, curbed, and bordered by sidewalks"). Additionally, while conspicuously posted "No Trespassing" signs will definitively establish that a road is restricted to the public and not a highway, "no soliciting" signs will not be dispositive. Kim, S.E.2d at 770, 773-74 (citing Furman v. Call, 362 S.E.2d 709, 711 (Va. 1987)) (explaining that the purpose of a no soliciting sign is to prohibit soliciting, not the entry of motor vehicles).

There is a prior Court of Appeals of Virginia decision holding that a road through a privately-owned mobile home complex was a highway because the roads within "were open to the unrestricted use of the public." Mitchell v. Commonwealth, 492 S.E.2d 839, 842 (Va. Ct. App. 1997). The complex did not post any "no trespassing" signs, the drivers passing through were not arrested for trespassing, and the roads within the trailer park were open to use by the public for vehicular travel. Id. at 839-40. However, Mitchell predates Kim v. Commonwealth, and therefore, did not discuss the criteria that the Supreme Court

15

of Virginia has since deemed relevant to proving unrestricted access (e.g., traffic signs, curbs, and sidewalks).

On this record, the roads within Hale's do not meet the statutory definition of a highway. The Government had the burden to prove that the roads within Hale's provide unrestricted access to the public for vehicular travel by more than a mere showing that the entrance lacks a gate or other physical barrier. Kim, 797 S.E.2d at 771. The Government's main evidence consists of (1) the lack of a physical barrier into Hale's allowing anyone to drive in, (2) the road being "well-defined," and (3) two posted traffic signs: a "Speed Limit 10" sign and a "Drive SLOW Children at Play" sign.[2] ECF No. 35 at 2-3, 8-9. Although traffic signs are one characteristic that may give rise to the presumption that a road within an apartment complex is a

_____

[2] The Government also offers more attenuated evidence, including (1) a "no soliciting" sign at the entrance to Hale's, (2) the presence of dumpsters and mailboxes in Hale's, and (3) various no trespassing signs posted on some residents' mobile homes. ECF No. 35 at 7-9. The "no soliciting" sign does not serve to restrict public vehicular travel, but it does not necessarily help to establish unrestricted access either. See Furman, 362 S.E.2d at 711 ("the purpose of [no soliciting] signs is to prohibit soliciting, not the entry of motor vehicles operated by members of the public."). Mailboxes and dumpsters would presumably be amenities provided for the benefit of the residents, so it is unclear how the presence of these things would establish that the road is unrestricted to the general public for vehicular travel. The Government has offered no evidence that the general public drives into Hale's to use these amenities. Likewise, the no trespassing signs posted by individual residents could cut either way. The Government argues that residents posting their own no trespassing signs suggests that the residents expect Hale's to be open to the public. ECF No. 35 at 8. However, the Government has offered no evidence to support this inference, and the posted signs could just as easily indicate the residents' belief that members of the general public were not permitted to trespass into Hale's.

16

highway, other relevant indicia—named roads, paved streets, curbs, and sidewalks—are absent here. See Kim, 797 S.E.2d at 772; Kay Management, 263 S.E.2d at 400. While not all of these features may be required to establish that a residential road is a highway, the Government's bare showing falls below the threshold.

Moreover, the other defining characteristics of Hale's roads suggest that they are not open to the public for unrestricted vehicular travel. The roads at Hale's are private, residential roads leading to less than twenty mobile homes. ECF No. 35 at 3. There exists only one entrance and exit on Cedar Level Road, so cars cannot pass through Hale's on its roadways. Transcript 65:13-16. The entrance road splits into two forks with one fork terminating in a cul-de-sac and another looping around five or so homes. ECF No. 35 at 2-3; Transcript at 15:6-22, 65:13-18. The main drive is only semi-paved, and the loop is a one-lane gravel road. ECF No. 35 at 2-3; Transcript 15:6-22.

In sum, these characteristics (and the lack of others) do not permit a finding that the public has unrestricted access to use Hale's roadway for vehicular travel. Instead, it appears from the record that Hale's roadway is more of an access road to the residences rather than a highway for unrestricted public travel. See Caplan, 563 S.E.2d at 724 (finding that "the

17

entrance to the Roanoker [Restaurant] from Colonial Avenue" was not a highway because it "was merely an access way to the parking lot" that lacked named streets, traffic signs, curbs, and sidewalks). Thus, the Hale's roadway does not qualify as a highway under Va. Code Ann. § 46.2-100.

Nevertheless, the traffic stop was still lawful because the officers could reasonably believe that the roadways in Hale's were highways and that Virginia's traffic laws applied to them. An officer's reasonable mistake of law can establish the probable cause or reasonable suspicion necessary to make an investigatory stop. See Heien v. North Carolina, 574 U.S. 54, 67 (2014). In Heien, the Supreme Court held that an officer made a reasonable mistake of law when he reasonably believed that an ambiguous North Carolina statute required both brake lights to be operational before the provision had been construed otherwise by North Carolina's appellate courts. Id. at 68. Here too, it was reasonable for the officers at the time of the stop to believe that the roadways within Hale's were highways. The issue is a mixed question of fact and law, and no bright-line rule exists to distinguish highways from non-highways. Kim, 797 S.E.2d at 769. At the time of the stop, no case had definitely established whether a roadway like the one in Hale's could be a highway. However, other Virginia cases had held that somewhat

similar private roads within residential neighborhoods were highways. See Mitchell, 492 S.E.2d at 842; Kay Management, 263 S.E.2d at 402. Thus, the officers' belief that Hale's roadway qualified as a highway would be a reasonable mistake of law under the then-existing cases. That belief gave the officers the probable cause necessary to make the traffic stop for the observed traffic violations. Because the stop was lawful, suppression is not warranted here.

### CONCLUSION

Under the totality of the circumstances, the officers had reasonable suspicion to stop Murphy's vehicle. The idling Audi blocking the road, the unusual seating position of the passengers, Murphy's evasive driving, and Hale's reputation for drug activity collectively gave rise to a reasonable suspicion of unlawful activity sufficient for a Terry stop.

Furthermore, even though the roadways within Hale's are not highways, the officers still had probable cause to make the stop based on the observed traffic violations because the officers could reasonably believe that the loop within Hale's was a highway under the law existing at the time. For the foregoing reasons, the Motion will be denied.


_____ /s/    _____

Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date:  January 4 , 2024